# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD LAIRD  *Plaintiff*,  v.  WELLPATH, f/k/a CORRECT CARE SOLUTIONS, LLC,  *Defendant*. | )<br>)<br>)<br>)<br>) Docket No.<br>)<br>)<br>) **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Richard Laird, by his attorneys at the Mizner Law Firm, files this Complaint against Wellpath, f/k/a Correct Care Solutions, LLC, and states as follows:

### A. Parties.

1. Plaintiff Richard Laird is an adult individual who is currently incarcerated at the State Correctional Institution at Greene ("SCI Greene").

2. Defendant Wellpath, formerly known as Correct Care Solutions, LLC ("Wellpath") is a Kansas Corporation with a principal place of business at 1283 Murfreesboro Pike Street 500, Nashville, TN 37217-2421. Wellpath provides, through a contract with the Commonwealth, medical care and services for the Department of Corrections, including the State Corrections Institute at Greene, during the relevant time period. Wellpath is vicariously liable for the acts of its employees, agents and/or servants.

### B. Jurisdiction and Venue

3. This Complaint includes claims made pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 1983.

1

4. This Honorable Court has jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 & 1343.

5. This Complaint also includes pendent state law claims, over which this Honorable Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6. Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within the territorial jurisdiction of this District and the Defendants are subject to personal jurisdiction within this District.

## C. Facts

7. The Pennsylvania Department of Corrections ("PADOC") issued, and its medical contractor, Correct Care Solutions, LLC, now known as Wellpath, enforced hernia guidelines which denied inmates with hernias individualized medical care except in emergency circumstances.

8. The hernia guidelines began: "Hernia surgery will be considered on an individual basis if the following criteria are met."

9. The hernia guidelines contained four elements which must be met before corrective surgery *was to be considered* on an *individual basis*:

    a. Presence of a hernia;

    b. Presence of a palpable mass;

    c. Irreducibility; and

    d. Signs and/or symptoms of strangulation.

10. The guidelines were not individualized, and were so restrictive that they effectively prevented prison medical providers from providing treatment consistent with the medical standard of care.

11. On May 17, 2017, the PADOC advised Wellpath that it had removed the hernia guidelines from its official directives in an email which stated, "Chapter 5-Hernia Guidelines: The contracted health care provider will coordinate the clinical care and treatment for hernias, therefore, this Chapter has been deleted."

12. Despite this, Wellpath continued to provide treatment of hernias for inmates in the same manner has it had previously; that is to say, denying surgical repair of hernias expect in emergency circumstances.

13. A hernia is defined as an organ or other tissue being forced through a weak spot in the abdominal wall.

14. Hernias can be extremely painful and debilitating, and if left untreated, can lead to infection, bowel obstruction, and even death.

15. Despite the fact that **surgical repair is the only way to correct a hernia and prevent those negative outcomes**, the PADOC had issued guidelines, implemented by Wellpath, refusing to provide individualized care, including hernia surgery, except in emergency circumstances.

16. These hernia guidelines prohibited medical providers from exercising individualized medical judgment and have resulted in the denial of surgical consultations, and surgery when necessary, to hundreds of inmates suffering from hernias, leaving them in severe

pain, unable to participate in normal daily activities, and at risk for serious medical complications, including death.

## **General Factual Allegations Hernias**

17. A hernia is defined as an organ or other tissue being forced through a weak spot in the abdominal wall. A hernia is known as "inguinal" when intestines, fat or other tissue contents of the abdomen enter into the groin area, where the lower abdomen meets the inner thigh. Throughout the course of a hernia, tissue may recede back into the abdomen and then bulge out again, depending on a number of factors including body position and activity levels.

18. Inguinal hernias are the most common type of hernia. Inguinal hernias can cause severe pain in men if the internal tissue is forced into the scrotum and impacts the testicles.

19. Hernias impacting the groin area (i.e., inguinal and femoral hernias) are very common—the prevalence of groin hernias has been estimated to be between five and ten percent (5-10%) in the United States. The estimated lifetime risk of developing a groin hernia is about twenty-five percent (25%) in men.

20. Inguinal hernias can cause severe pain. The level of pain usually increases during and/or after activity or exertion. Typically painless and ordinary activities of daily living such as walking, running, lifting, coughing, urinating, defecating, or even sitting up can cause herniated tissue to bulge out of the abdominal wall, causing intense and excruciating pain. Hernias may become so painful that they prevent patients from engaging in any activities, even leaving a suffering patient bedridden. Other symptoms of inguinal hernias include weakness, feelings of heaviness, burning, tearing, or aching in the groin; or a swollen or enlarged scrotum.

21. A hernia that is left without surgical repair can cause serious complications. One of the most serious hernia complications is when the intestines bulge through the abdominal wall and become trapped in the scrotum, or outside the abdominal wall. This condition is a medical emergency which can lead to bowel obstructions, tissue necrosis, sepsis, the excision of intestines, and even death.

22. Although a larger hernia may visually appear "worse," in fact there is no correlation between hernia size, and the amount of pain it can cause. A patient may experience much more pain with a small hernia than a large hernia, or vise versa.

23. A hernia that can be "pushed back" into the body is referred to as "reducible." Many times, however, the bulging tissue of the hernia becomes trapped and cannot be pushed back into place—this is a non-reducible, or "incarcerated" hernia. Reducible hernias can even more painful than non-reducible hernias. Hernias may be reducible at times and non-reducible at others, and a reducible hernia can become permanently non-reducible, or "incarcerated," at any time.

24. An inmate with a hernia may face unique challenges. For example, there are times when an inmate simply does not have the freedom to lie down on the ground to push his intestines back into place. This can become necessary at any time for a patient with a hernia, whenever the hernia bulges out of the abdominal wall.

25. If an incarcerated hernia is untreated, it can at any time become "strangulated," meaning the blood supply to the bulging tissue is cut off, causing the tissue to die. When this happens, the tissue dies. Strangulation is an emergency situation, requiring immediate surgery to

correct the condition. Failure to treat a strangulated hernia can lead to severe infection, intestinal obstruction, the excision of intestines, and death.

26. Hernias are usually diagnosed with a physical exam, in conjunction with a review of the patient's medical history. X-rays, CT scan, or ultrasound testing may be helpful, but are not conclusive - a negative scan does not mean that no hernia is present.

27. A hernia belt, or truss, can temporarily relieve hernia discomfort if it fits properly. It does not heal the hernia. It does not eliminate the risk of strangulation. Most patients find a truss unsatisfactory and do not wear them.

28. The *only* treatment that can correct an inguinal hernia is surgical repair. The tear or weakness in the abdominal wall which permits the tissue to bulge through cannot heal on its own. Therefore, a patient will continue to suffer from intense pain, discomfort, and limited activity until corrective surgery is performed. Failing to provide corrective surgery also leaves a patient vulnerable to other complications, including the risk of infection, intestinal obstruction, and death. The risk of developing complications increases the longer a hernia is left untreated.

29. The correct first step in hernia treatment is referral to a surgeon for consultation. Corrective surgery is generally recommended for patients with hernia who are experiencing any of the following symptoms: pain, an inability to walk, an inability to work or engage in other normal life activities, or other symptoms.

30. The medical standard of medical care for symptomatic hernias is surgical repair. This surgery should be conducted as soon as possible after the hernia is detected. Basing the decision to perform surgery on whether the hernia is reducible, irrespective of other symptoms, falls far below accepted medical practice and the standard of care.

31.     Surgical repair of inguinal hernias is one of the most common surgeries performed in the United States, and it is a relatively simple procedure. More than one million abdominal wall hernia repairs are performed each year in the United States, with inguinal hernia repairs constituting nearly 770,000 of these cases.

32.     Although hernia surgery is typically referred to as "elective," that designation has no bearing on whether the condition it will alleviate is a serious medical need. Any procedure that it not an emergency can be classified as elective. An elective surgery only means there is sufficient time to schedule the surgery as opposed to going into surgery immediately on an emergent basis; this does not mean that failure to perform the surgery is not below the standard of care, indeed it is, and it does not mean the condition will not result in severe pain and other serious complications, because it can.

**Wellpath's Unlawful Policy of Denying Hernia Surgeries**

33.     People incarcerated within the PADOC are completely dependent upon the prison medical providers to provide them with medical care. Inmates are not free to obtain their own care, even if they can pay for it.

34.     In general, the delivery of medical care within the PADOC is supposed to work in the following manner. If an inmate has a medical issue, he can access sick call in the medical department, where he usually sees a nurse. The nurse can refer the inmate for an appointment with the Wellpath physician. If the physician believes a consult with a specialist is needed, the physician can request a consultation. That request is forwarded to the Wellpath Regional Medical Director (RMD).

35. The Wellpath RMD can either approve or deny the request. If the request is approved, the inmate is sent to the specialist. Then the process repeats itself: If the specialist feels a certain procedure is needed, then the RMD once again must approve the procedure. If approved, the procedure is scheduled at some point in the future. If not approved, no surgery is scheduled.

36. The Wellpath RMD is in effect the "gatekeeper" and makes the final determination whether medical care will be provided. The RMD's decision is usually made by someone who is *not* a specialist in the area at issue, and usually without ever seeing the patient or first consulting with the prison physician or the specialist.

37. When someone presents with a painful hernia, one of several things happen: the Wellpath physician refuses to submit a consult request for the patient to see a general surgeon for surgical evaluation based on the hernia guidelines.

38. Alternatively, the prison physician might submits the request, which is then denied by Wellpath RMD based on the hernia guidelines. Or, the consult request is granted, but after the surgeon recommends surgery, the surgery is denied by RMD, again, based on the hernia guidelines. All of these actions are taken pursuant to Wellpath policy.

39. Per the terms of the aforementioned contract between the PADOC and Wellpath:

a) Wellpath is required to provide health care services "in accordance with the Pennsylvania Department of Corrections (PA DOC) Management & Administration of Health Care Procedures and Access to Health Care Manuals; and

b) Wellpath is required to ensure health care service are delivered to state and national standards; and

c) Wellpath is responsible for paying for all outpatient costs incurred whenever an inmate is sent to an outside hospital or physician for care.

8

40. In its Final Negotiated Cost Submittal Worksheet[1], Wellpath's predecessor's contract had a cost breakdown which allocated $10,500,000.00 for "Outside Hospitalization." Therefore, Wellpath's financial interest are best served by keeping its outpatient costs as low as possible.

41. Rather than making decisions based on individualized medical judgment consistent with the standard of care, Wellpath makes healthcare decisions based on costs, in a way that prevents medical professionals from exercising independent and individualized medical judgment in deciding what treatment to provide and when it should be provided.

42. This decision-making directly impacts Wellpath's approach to patients with hernias.

43. The PADOC promulgated hernia guidelines until 2017, contained in the Access to Health Care Manual, and Wellpath implemented and enforced these guidelines.

44. The hernia guidelines denied both individualized care and medically necessary surgeries to inmates, except in emergency circumstances.

45. The hernia policy which Wellpath implemented, and continued to enforce even after the PADOC terminated the policy, violates the standard of care because:

    a. hernia surgery must considered on an individual basis;

    b. the standard of care for a patient experiencing pain and discomfort, or who is being limited in his daily activities, is to be referred to a surgeon for consultation;

    c. for hernias, pain and incarceration are danger signs that strangulation is imminent and these medical danger signs need to be treated. Therefore, hernias must be fixed before, not after, incarceration and waiting for an emergency to happen

---

[1] This Final Negotiated Cost Submittal Worksheet is part of the contract between PADOC and Wellpath.

>   before providing treatment is improper; and
>
>   d. withholding surgery until after strangulation, is akin to withholding treatment of cardiac angina until a full-blown heart attack has occurred or like refusing to rescue a swimmer in distress, until the person has begun to drown.

46. No medical basis exists for restricting hernia surgery in the manner required by Wellpath's hernia policy.

47. In the United States only about 1% of inguinal hernia surgery is performed emergently for strangulation. That means 99% of inguinal hernias in the United States are corrected "electively," under circumstances that would not be approved by the hernia guidelines.

48. As stated above, when someone presents with a painful hernia, one of several things happen: 1) the Wellpath physician refuses to submit a consult request for the patient to see a general surgeon for surgical evaluation based on the hernia guidelines; 2) the prison physician submits the request, which is then denied by the Wellpath RMD because of the hernia guidelines; or 3) the consult request is granted, but after the surgeon recommends surgery, the surgery is denied by the Wellpath RMD based on the hernia guidelines.

49. All of these actions are taken pursuant to the Wellpath policy of enforcing the old PADOC limitations on treating hernias.

50. The enforcement of the hernia policy denies inmates individualized care and causes the wanton infliction of pain, suffering and the risk of serious harm or death.

51. For these reasons, the policy implemented by Wellpath constitutes deliberate indifference to the serious medical needs of Mr. Laird, in violation of the Eighth Amendment to the United States Constitution.

**Mr. Laird's suffering due to inadequate medical care.**

52. Mr. Laird is incarcerated at SCI Greene.

53. On September 28, 2008, Mr. Laird was seen at the medical department for a physical examination, where his hernia was noted for the first time. He was placed on a list to have the hernia examined by Dr. Byunghak Jin.

54. On December 29, 2008, Mr. Laird's hernia was examined by Dr. Jin, who advised him that he had a small rupture, and that there was nothing to worry about.

55. Mr. Laird was seen for a physical examination on October 5, 2009, where he was again referred to Dr. Jin because of his hernia.

56. Just as the year before, on December 24, 2009, Dr. Jin checked Mr. Laird's hernia, and advised him that he might need to get it fixed when he was sixty. Mr. Laird was only forty-six years old at that time.

57. At that point, Mr. Laird became discouraged that there was any chance of having his hernia repair before he turned sixty.

58. Moreover, he was very concerned about having surgery while in prison, and did not want to undergo surgery unless he absolutely had to do so.

59. Therefore, he stopped attempting to obtain surgical repair of his hernia for a number of years.

60. Unfortunately, in the summer of 2019, the pain from Mr. Laird's hernia was becoming so intrusive that he was unable to cope with it any longer, and he again sought medical treatment of his hernia.

61. On July 26, 2019, Mr. Laird submitted a sick call slip, which in addition to requesting renewal of his blood pressure medicine, stated "Hernia. Increase in size. Pain."

62. Later that same day, Mr. Laird was seen by PA Mark Hammer, who took note of the size of the hernia, which was roughly the size of a golf ball. Mr. Laird advised him that the hernia was causing him pain, and requested that it be surgically repaired.

63. PA Hammer replied that because the hernia was reducible, the hernia did not present a medical problem, and that surgery would not be provided.

64. PA Hammer stated that Mr. Laird would be provided with a hernia truss, but not corrective surgery, even though he had already suffered with the hernia for eleven years.

65. Mr. Laird therefore filed a grievance that same day, describing his medical history, his interaction with PA Hammer who had denied him surgery, and including a request for corrective surgery.

66. On August 20, 2019, Mr. Laird receive the Initial Review Response from Mr. Nicholson, denying his request for care. Mr. Nicholson's Response included in pertinent part:

> You were seen by the providers on 7/26/19 as you state but it was for a chronic care clinic. The visit was focused on the clinic(s) that you were being seen for, not the hernia. There is no documentation during that visit of anything regarding a hernia. To have a full exam regarding the treatment of the hernia, you will need to put in a sick call slip specifically about the hernia and your options for treatment. At this time, you have not requested treatment, at least not at the appointment of 7/26/19. Surgery is certainly an option, however there are circumstances that you would need to have in order for the surgery to be indicated. At this time, you do not. The information you claim you were told by PA Hammer is the correct answer. You can wear a truss to help and reduce it when possible. This is the standard of care and is appropriate.

67. On August 21, 2019, Mr. Laird filed a timely appeal to the facility manager, asking "In the initial response W. Nicholson states, 'surgery is certainly an option, however there

are circumstances that you would need to have in order for the surgery. At this time, you do not.' If I were not examined on 7-26-19 how does Mr. Nicholson know that I do not meet said circumstances."

68. Mr. Laird also corrected Mr. Nicholson's incorrect statement that he was not seen about his hernia, writing: "I submitted a sick call slip the morning of 7-26-19 [which stated] 'Hernia. Increase in Size. Pain.'"

69. On September 4, 2019, the facility manager denied Mr. Laird's appeal, writing: "The response provided by the grievance officer is upheld. Your records indicate that on 7/26/19, you were seen by PA Hammer at Chronic Care Clinic, but not for your hernia."

70. Mr. Laird timely filed his final appeal on September 5, 2019.

71. A few days later, on September 27, 2019, Mr. Laird was again seen by PA Hammer, who this time noted in the medical records that he was complaining of a hernia and was requesting surgery. However, PA Hammer did not order a surgical consultation, but only fit him for a hernia truss.

72. Mr. Laird received a final appeal decision denying his grievance on October 9, 2019.

73. The denial stated, "You state that you have had this hernia for approximately 11 years. You take issue with the denial to have a hernia repair. You are seeking the repair along with monetary relief. A review of the records by the Bureau of Health Care Services reflects that the medical care provided was reasonable and appropriate."

74. The grievance process clearly demonstrates that Mr. Laird was systematically denied any opportunity for surgical repair of his hernia, through implementation of a hernia

policy which was "officially" discontinued by the Department of Corrections in 2017, but is still being actively enforced by Wellpath, its employees and contractors.

75. There is no doubt that a Wellpath employee determined that Mr. Laird needed medical intervention for his hernia, because on October 8, 2019, he was permanently issued a hernia truss by PA Hammer.

76. This hernia policy is in blatant violation of the well-established medical standard of care for the treatment of hernias.

## COUNT I - DELIBERATE INDIFFERENCE
## IN VIOLATION OF THE EIGHTH AMENDMENT

*Richard Laird*
*v.*
*Wellpath f/k/a Correct Care Solutions, LLC*

77. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

78. The medical policy makers for Wellpath know about and enforce the hernia policy described herein, which is to deny surgery for all hernias which do not present a medical emergency.

79. Wellpath knew of Mr. Laird's serious medical needs.

80. Despite this knowledge, Wellpath has intentionally denied Mr. Laird individualized care and has intentionally delayed treatment that will address his serious medical needs.

81. Wellpath has caused the wanton infliction of pain upon PADOC inmates, and has exhibited deliberate indifference to the serious medical needs of Mr. Laird, in violation of the Eighth Amendment.

82. By denying Mr. Laird individualized care and treatment of his hernia consistent the medical standard of care, Wellpath have imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

83. Wellpath's denial of Mr. Laird's medically needed hernia surgery violates all standards of decency, contrary to the Eighth Amendment.

84. Wellpath's actions and "treatment" with respect to Mr. Laird's hernias is so cursory as to amount to no medical care at all.

WHEREFORE, Plaintiff Richard Laird seeks judgment in his favor and against Wellpath, including an injunction requiring Wellpath to provide him with all medically appropriate care, including a surgical consultation and surgery if recommended, as well as a monetary award in an amount in excess of $75,000, along with all other relief permitted by law.

## COUNT II
## PROFESSIONAL NEGLIGENCE

*Richard Laird*
*v.*
*Wellpath f/k/a Correct Care Solutions, LLC*

85. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

86. As Mr. Laird's treating medical providers, employees and/or agents of Wellpath, including but not limited to Dr. Byunghak Jin and Mark Hammer, PA, owed a duty of care to

Mr. Laird to ensure that he was referred for a surgical consultation, and provided corrective surgery if recommended by the examining surgeon.

87. Another aspect of this duty was to provide Mr. Laird with the minimum standard of care required for someone in his condition and with his medical needs.

88. The standard of care for someone in Mr. Laird's condition is to be referred to a surgeon for a consultation, and to follow the recommendation of the surgeon which is usually to surgically repair the inguinal hernia.

89. Dr. Jin and PA Hammer, as well as possibly other employees and/or agents of Wellpath, failed and refused to ensure Mr. Laird was referred to a surgeon for a consultation and to follow the recommendation of the surgeon.

90. As stated above, the PADOC contracted with Wellpath to provide medical care and services for the Department of Corrections, including the SCI Greene, during the relevant time period.

91. Wellpath and/or its employees and/or agents are responsible to ensure that Mr. Laird was referred to a surgeon for a consultation and to follow the recommendation of the surgeon.

92. The only way to assure that Mr. Laird receives the medical care and surgery his condition requires, is via an injunctive order directed to Wellpath.

93. Without such an injunction, Mr. Laird may never receive medically necessary services, including surgical repair, unless it is an emergency surgery to correct a strangulated hernia.

94. Forcing Mr. Laird to wait until his hernia worsens to the level of a medical emergency, as Wellpath has demonstrated it intends to do, is unjust, dangerous and violates the standard of care with which Mr. Laird should be treated.

95. Mr. Laird lacks an adequate remedy at law, because as an inmate he is incapable of arranging for a surgical consultation on his own.

96. The medical care, diagnosis, treatment and services rendered by Dr. Jin and PA Hammer, and possibly other employees and/or agents of Wellpath, was performed in a negligent and careless manner and not in accordance with professional standards required of the conditions presented by Mr. Laird.

97. Dr. Jin and PA Hammer, and possibly other employees and/or agents of Wellpath, failed to possess and/or exercise adequate medical skills, knowledge, experience and techniques for the proper treatment of Mr. Laird.

98. As a direct and proximate result of the negligence by the employees and agents of Wellpath, including but not limited to Dr. Jin and PA Hammer, and possibly other employees and/or agents of Wellpath, Mr. Laird has continued to suffer severe injury and pain, and lives with constant risk of greater injury.

99. As a direct and proximate result of the negligence by the employees and agents of Wellpath, including but not limited to Dr. Jin and PA Hammer, Mr. Laird has experienced pain and suffering and loss of life's pleasures.

100. As a direct and proximate result of the negligence by the employees and agents of Wellpath, including but not limited to Dr. Jin and PA Hammer, Mr. Laird has experienced pain

and suffering, inconvenience, limitation on activities of daily living, mental anguish, and humiliation and embarrassment.

101.   Wellpath is vicariously liable for the negligent actions of its employees and/or agents, including but not limited to Dr. Byunghak Jin and PA Hammer.

WHEREFORE, Plaintiff Richard Laird seeks judgment in his favor and against Wellpath, including an injunction requiring Wellpath to provide him with all medically appropriate care, including a surgical consultation and surgery if recommended, as well as a monetary award in an amount in excess of $75,000, along with all other relief permitted by law.

Respectfully submitted,

MIZNER LAW FIRM

By: /s/ John F. Mizner

John F. Mizner
PA Bar No. 53323
jfm@miznerfirm.com

Joseph P. Caulfield
PA Bar No. 322823
jpc@miznerfirm.com

311 West Sixth Street
Erie, Pennsylvania 16507
(814) 454-3889

*Attorney for the Plaintiff*